IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

FILED
04 SEP 28 PM 3:48
U. ...
N.D. OF ALABAMA

ROBERT WILCOX,                          )
                                       )
                Plaintiff              )
                                       )
        vs.                            )       CASE NO. CV03-HGD-0722-M
                                       )
THE STANDARD INSURANCE COMPANY,        )
                                       )       **ENTERED**
                Defendant              )
                                       )       SEP 2 8 2004

### MEMORANDUM OPINION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

The above-entitled civil action is before the court on the Motion for Summary
Judgment filed by plaintiff [Doc. #10], the Motion for Summary Judgment filed by defendant
[Doc. #12], the Motion to Strike Exhibits B, C, and D as Attached to the Affidavit of Lisa
Gates filed by plaintiff [Doc. #15], the Motion to Continue Cross Motions for Summary
Judgment filed by plaintiff [Doc. #22], the Motion to Remand filed by plaintiff [Doc. #23],
the Motion to Allow Additional Evidence filed by plaintiff [Doc. #31], and the Motion to
Allow Additional Submission filed by plaintiff [Doc. #33].

In his complaint, plaintiff, Robert Wilcox, alleges that he was insured under a long
term disability (LTD) benefits policy issued by defendant, The Standard Insurance Company
(Standard). Prior to his alleged disability, plaintiff states that he worked full time at Turner
Industries. Plaintiff claims that defendant never provided a copy of the LTD policy to
plaintiff. On February 12, 2001, plaintiff filed a claim for LTD benefits, and defendant

40

granted the claim. Plaintiff avers he had two herniated discs and was in severe pain. By letter dated November 19, 2002, Standard notified plaintiff it was discontinuing his LTD benefits as of December 1, 2002. The benefits were terminated based on a policy amendment effective January 1, 2000, limiting LTD benefits to a period of 12 months for any musculoskeletal and connective tissue disorders. Wilcox asserts state law causes of action for breach of contract, bad faith, and failure to disclose and seeks a declaratory judgment. Plaintiff contends that his state law claims are not preempted by the Employee Retirement Income Security Act (ERISA) because he paid the premiums through a payroll deduction, and the insurance was voluntary. Plaintiff contends he is owed $13,180 for benefits for the period of December 1, 2002, to the time of the filing of the complaint on March 31, 2003, and benefits for the time thereafter at a rate of $3,295 per month. Defendant asserts in its answer that plaintiff's claims are preempted by ERISA and that he has not exhausted his administrative remedies with respect to some of his claims.

Plaintiff filed a Motion for Summary Judgment, seeking judgment for seven months of long term disability benefits for the period of December 2002 to June 30, 2003, in the amount of $23,065, with interest thereon, as well as reinstatement of future LTD benefits. [Doc. #10]. Defendant filed a cross Motion for Summary Judgment, asking for a ruling that plaintiff's benefits were properly terminated and that he is not entitled to future benefits. [Doc. #12].

2

The submissions of the parties establish the following facts.  Turner Industries, Ltd., has a Group Long Term Disability Insurance Policy through Standard Insurance Company. [Plaintiff's Exh. 2].  The original policy provided that the Maximum Benefit period was "the longest period for which LTD Benefits are payable for any one period of continuous Disability."  [*Id.* at 18].  The Maximum Benefit Period is determined by the age when the disability begins; for a person age 61 or younger, the Maximum Benefit Period is to age 65 (or three years and six months, if longer).  [*Id.* at 2].  Under the original policy provisions, there was no limitation on the benefit period for musculoskeletal or connective tissue disorders.

The policy states that, "If you become Disabled while insured under the Group Policy, we will pay LTD benefits according to the terms of the Group Policy after we receive satisfactory Proof of Loss."  [*Id.* at 4].  The policy also provides that Standard has "full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group policy."  [*Id.* at 13].[1]  The policy further states that Standard's authority includes, but is not limited to:

1.      The right to resolve all maters when a review has been requested;

2.      The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;

---

[1]   It is apparent from the Group Policy and the Summary Plan Description that fiduciary responsibility under the plan has been delegated to Standard.

3.    The right to determine:
    a.    Eligibility for insurance;
    b.    Entitlement to benefits;
    c.    Amount of benefits payable;
    d.    Sufficiency and the amount of information we may reasonably require to determine a., b., or c., above.

Subject to the review procedures of the Group Policy, any decision we make in the exercise of our authority is conclusive and binding.

[*Id.* at 13-14]. The policy states that "[b]enefits under the Group Policy are limited to its terms, including any valid amendment" and that "[n]o change or amendment will be valid unless it is approved in writing by one of our executive officers and given to the Policyowner [Turner Industries] for attachment to the Group Policy." [*Id.* at 17].

Along with the Group Long Term Disability Insurance Policy, there was issued a Certificate and Summary Plan Description. [Plaintiff's Exh. 4]. The identical language allocating authority to Standard appears in the Summary Plan Description. [*Id.* at 16-17]. The Group Policy and Summary Plan Description together make up the ERISA plan, for purposes of 29 U.S.C. § 1102(a)(1). *See Shaw v. Connecticut General Life Ins. Co.*, 353 F.3d 1276 (11th Cir. 2003); *Alday v. Container Corp. Of America*, 906 F.2d 660, 666 (11th Cir. 1990).

Group Policy Amendment No. 3, effective January 1, 2000, amends the Exclusions and Limitations portion of the policy to add, *inter alia*, a 12-month limitation period for musculoskeletal and connective tissue disorders. [Plaintiff's Exh. 3]. The amendment further provides in pertinent part:

4

> Payment of LTD Benefits is limited to the Musculoskeletal And Connective Tissue Disorder Limitation Period shown in Coverage Features during your entire lifetime for a Disability caused or contributed to by musculoskeletal or connective tissue disorders including, but not limited to:
>
> 1. Any disease or disorder of the cervical, thoracic or lumbosacral back and its surrounding soft tissue.
>
>         \* \* \* \* \* \*
>
> This limitation will not apply to:
>
> a. Herniated disks with neurological abnormalities that are documented by electromyogram, and computerized tomography or magnetic resonance imaging.
>
>         \* \* \* \* \* \*
>
> d. Radiculopathies that are documented by electromyogram.

[*Id.*]. That amendment is signed by Standard's president and corporate secretary and is contained in the revised Certificate and Summary Plan Description: Group Long Term Disability Insurance, shown as "Printed and Revised 04/2000." [Plaintiff's Exhibits 3, 4]. The revised plan contains the same wording as set out above. [*See id.*].

Plaintiff, Robert Wilcox, was born on April 17, 1944. He was the maintenance supervisor for Turner Industries from 1997 to 2000. While at Turner Industries, he purchased LTD insurance and paid the premiums. [Plaintiff's Exh. 1]. During November 2000, Wilcox injured his back while moving a tree at his home. He submitted a claim for short term disability (STD) benefits due to pain. He received 13 weeks of STD benefits. [*Id.*; Plaintiff's Exh. 9].

Plaintiff received an MRI on January 5, 2001. The test findings were:

5

> The L2-3 levels shows a questionable tiny central subligamentous herniation on the sagittal scans which is not well visualized on the axial scans and only minimally effaces the anterior thecal sac. . . . The L3-4 level shows minimal degeneration and bulging of the disc, slightly effacing the anterior thecal sac. . . . The L4-5 level also shows minimal bulging of the disc, slightly effacing the anterior thecal sac. . . . The L5-S1 level shows a tiny central disc protrusion consistent with a herniation which minimally abuts the anterior thecal sac.

[Plaintiff's Exh. 8]. The impression from the MRI was:

> 1.     Minimal degenerative spondylosis and ventral extra-dural defects at T11-12, T12-L1, and L1-2.
> 2.     Questionable tiny central subligamentous herniation of the L2-3 disc, only well seen on the sagittal scans and of doubtful significance.
> 3.     Minimal bulging of the L3-4 and L4-5 discs.
> 4.     Small central herniation of the L5-S1 disc, minimally abutting the anterior thecal sac.

[*Id.*]. Standard approved STD benefits on January 30, 2001. [Plaintiff's Exh. 9]. Wilcox began receiving LTD benefits from Standard on February 12, 2001. He continued to receive LTD benefits through November 19, 2002, because his file was under review until that time. [Plaintiff's Exh. 21]. His benefits were $3,295 per month or 50% of his gross income. [Plaintiff's Exh. 1].

On June 11, 2001, plaintiff's treating physician, Dr. Michael Brown, completed a Long Term Disability Physician's Statement on a form provided by Standard. He listed the primary diagnosis as herniated lumbar disc and stated the planned course of treatment was continued injections, Vioxx and occasional Norco, and referral to a neurosurgeon. [Plaintiff's Exh. 10].

Plaintiff received another MRI on July 11, 2002.  The test showed:

> There is decreased signal intensity involving all of the lumbar disc spaces but most marked at L5-S1 and L2-3. . . . At the L5-S1 disc level, there is a moderate sized posterior central disc protrusion producing mild ventral thecal sac indentation but no definite impingement upon the proximal S1 nerve roots.  At the L4-5 disc level, there is a minimal focal posterior central disc protrusion producing no thecal sac indentation.  At the L2-3 disc level, there is mild diffuse annular bulge.
>
> CONCLUSION:
> 1.  Moderate sized posterior central disc protrusion at L5-S1 producing minimal thecal sac indentation but no S1 nerve root impingement.
> 2.  Minimal focal posterior central disc protrusion at L4-5 producing no thecal sac indentation.
> 3.  Mild diffuse annular bulge at L2-3.

[Plaintiff's Exh. 12].

On November 15, 2002, Dr. Steven Beeson, a physician consultant for Standard, sent a letter to Nurse Sue Hinkle after reviewing plaintiff's medical records.  [Plaintiff's Exh. 14]. Dr. Beeson noted that the MRI done on January 5, 2001, showed diffuse degenerative joint and degenerative disk disease from T11 through L5 but no definite neurologic involvement. It was noted also that plaintiff began seeing Dr. Naguszewski on August 21, 2001, and it was felt that he had a probable L5 right sided radiculopathy despite the negative MRI scan.  Dr. Beeson mentioned that EMG studies were done by Dr. Naguszewski and were negative and that plaintiff continued to see Dr. Naguszewski for regular follow-ups with no significant improvement.  Multiple medications were tried for pain relief, without much effect.  Dr. Beeson stated that plaintiff's MRI scan showed a very small disk herniation at L5-S1 that

appeared to be minimally abutting the anterior thecal sac but without evidence of neurologic involvement. He also noted the minimal bulging of the disks at L3-4 and L4-5 and a possible central subligamentous herniation of L2-3 of questionable significance. However, he stated that "it is not clear that the small disk herniations are in any way related to the patient's pain syndrome" and that "further diagnostic modalities might be helpful," such as a CT/myelogram if the MRI scan is nonconclusive. [*Id.*].

Standard sent a letter to plaintiff dated November 19, 2002, in which it informed him that his LTD benefits were limited to a period of 12 months for conditions caused or contributed to by a musculoskeletal or connective tissue disorder. [Plaintiff's Exh. 15]. Attached to the letter was a copy of the amendment to the Group Policy, effective January 1, 2000. Wilcox was unaware of the amendment prior to the November 19 letter from Standard. [Plaintiff's Exh. 1].

Plaintiff appealed the termination of his benefits and included a letter from his physician, Dr. William K. Naguszewski, dated December 6, 2002. [Plaintiff's Exh. 16]. Dr. Naguszewski stated in the letter that Dr. Michael Brown referred plaintiff to him, and his initial examination took place on August 21, 2001, when plaintiff presented with significant right leg pain. He also stated that the MRI of January 5, 2001, showed minimal degenerative spondylosis and a small disk herniation at L2-3, as well as a small central disk herniation at L5-S1. Dr. Naguszewski further stated:

> Epidurals were not beneficial and my examination showed a
> decrease in sensation involving the entire right calf below the

8

knee and the lateral aspect of the right calf in particular. Nerve conduction studies and EMG were normal. My impression was that the patient was suffering from a right L5 radiculopathy.

I have since followed the patient. ... the patient has continued to suffer from low back pain and he has had a more recent lumbar MRI July 11, 2002 which now shows progression in his disk herniations with a moderate central disk protrusion at L5-S1 placing some indentation on the thecal sac and also a small protrusion at L4-5. ... At this time the patient remains under my care for ... ongoing low back pain. He has not done well with epidurals and he has had only modest benefit from Neurontin. ... At this time the patient is under severe restrictions that prevent him from doing any bending, lifting or stooping because of his chronic radiculopathy.

[*Id.*]

On December 19, 2002, Nurse Hinkle wrote a letter to Dr. Beeson, asking whether

plaintiff's situation was subject to the musculoskeletal limitation of the policy. [Plaintiff's

Exh. 18]. Dr. Beeson replied:

New information has also been submitted in the form of an MRI scan done on 7/11/2002. This showed a moderate sized posterior central disk protrusion with minimal thecal sac indentation but no S1 nerve root impingement. There is also disk protrusion at L4-5 but no neurologic compromise is noted. Again, there is mild annular bulging at L2-3 without definitive nerve root involvement.

Previous EMG studies have been negative. There is no definite neurologic abnormalities documented by either MRI, CT or electromyogram. Although the patient has pain that radiates into the leg, this is not in and of itself sufficient information to indicate that [he] has a radiculopathy. Insofar as [he] has chronic back pain without objective evidence of a radiculopathy, I think this probably does fall under the limitations and restrictions in [his] policy regarding musculoskeletal diseases.

9

[Plaintiff's Exh. 19].

On December 30, 2002, Standard denied plaintiff's claim for LTD benefits and referred the claim for appeal. The denial stated that plaintiff's file had been forwarded to a physician consultant for review to determine if plaintiff was experiencing neurological abnormalities documented by electromyogram, and computerized tomography or magnetic resonance imaging. The letter further stated:

> The physician who review [sic] your file noted that the most recent MRI scan from July 11, 2002 documented that you had a moderate sized posterior central disk protrusion with minimal thecal sac indentation but no S1 nerve root impingement. There was also a disk protrusion at L4-5 but no neurological compromise was noted. Also a mild annular bulging at L2-3 was noted but again there was no evidence of nerve root impingement.

> Because there was no evidence of definite neurological abnormalities documented by MRI, CT or electromyogram your condition falls under the musculoskeletal connective tissue limitation of the group policy and your claim will remain closed.

> Please note, we are not doubting that you have been under the care of a physician or that you may be experiencing limitations as a result of your back condition. Rather we are applying then policy provisions as written in the Turner group policy.

[Plaintiff's Exh. 20].

On January 31, 2003, Standard issued a final denial after further independent review which stated:

> A MRI of your lumbar spine revealed a moderately sized disk herniation at the L5-S1 level with no S1 nerve root impingement and a small disk herniation at the L2-3 level without definitive

10

nerve root involvement. Additionally, there is a herniated disk at the L4-5 level, which did not reveal a neurologic compromise. Nerve conduction studies and electromyogram (EMG) testing were normal.

According to the Musculoskeletal and Connective Tissue Disorder Limitation, herniated discs with neurological abnormalities that are documented by electromyogram (EMG) and computerized tomography or MRI studies are not limited to 12 months of benefits. In addition to this, radiculopathies that are documented by electromyogram (EMG) studies are also not considered limited conditions under the terms of the group policy. We understand that you have been diagnosed with herniated disks and lumbar radiculopathy, however, your LTD claim must still be limited due to the musculoskeletal and connective tissue disorder limitation because the medical evidence in your claim file fails to document neurological abnormalities by electromyogram, computerized tomography and/or MRI studies. Furthermore, it is our understanding that merely experiencing back pain, which reportedly radiates into a lower extremity, is not in and of itself sufficient evidence to support a radiculopathy.

[Plaintiff's Exh. 21].

## Motion to Strike Exhibits [Doc. #15]

Plaintiff seeks an order striking Exhibits B, C, and D attached to the affidavit of Lisa

Gates. [Attachment to Doc. #12]. Gates, a Benefits Review Specialist with Standard, attests

that Exhibits A and B are records kept by Standard in the regular course of business and that

Exhibits C and D are pages available on the Internet. Exhibit A to the affidavit is a letter to

Kevin Scroggins at Standard from Vickie Witty, Benefits Manager for Turner Industries,

dated September 15, 1999, asking Standard to amend insurance policies effective January 1,

2000, in accordance with their previous discussion.  Witty requests amendment of the LTD

policy to add a 12-month limitation for a rate change of $.64/1000.  Exhibit B is a "Mail-Out

Transmittal" from Standard to "Scroggins/Hougo" regarding the Group Policy for Turner

Industries and Amendments 2, 3, and 4.  It is dated March 28, 2000.  The exhibit indicates

that the policy amendments and a specimen certificate were attached to the transmittal.

Exhibits C and D are pages from the Internet about back pain and MRIs.

Exhibit B is submitted by defendant as evidence that the amendments to the Group

Policy, including the amendment applied to limit plaintiff's LTD benefits, was transmitted

to Turner Industries.  In light of other evidence that the amendment was transmitted to Turner

Industries, the motion to strike Exhibit B is DENIED.  The motion to strike Exhibits C and

D is GRANTED.

**Motion to Continue Cross Motions for Summary Judgment [Doc. #22]**

Plaintiff asks that the court continue the cross motions for summary judgment filed

by the parties to allow him time to submit an EMG of his back.  Because plaintiff has since

filed a motion to submit that EMG report, the motion to continue is MOOT.

**Is ERISA Applicable to Plaintiff's Claims?**

The court first must determine whether ERISA preempts all claims made by plaintiff

in this action.  Plaintiff has asserted state law claims of breach of contract, bad faith, and

failure to disclose. Title 29 U.S.C. § 1003(a) states that the provisions of ERISA "apply to any employee benefit plan if it is established or maintained--(1) by any employer engaged in commerce or in any industry or activity affecting commerce; or (2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or (3) by both." The terms "employee welfare benefit plan" and "welfare plan" mean:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1). It is clear that the Group Long Term Disability Policy at issue here is an employee welfare benefit plan within ERISA's coverage.

A state law claim "relates to" an ERISA benefit plan for purposes of ERISA preemption whenever the alleged conduct at issue is intertwined with a refusal to pay benefits. *Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir. 1997). State law claims that "have a connection with [an] ERISA plan" are preempted. *Morstein*

13

*v. National Insurance Services, Inc.*, 93 F.3d 715, 722 (11th Cir. 1996) (*en banc*). *See also* 29 U.S.C. § 1144(a).[2]

Plaintiff's claims for breach of contract and bad faith refusal to pay benefits are preempted by ERISA. *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (claim for breach of contract as to long term disability plan preempted by ERISA); *Swerhun v. Guardian Life Insurance Co. of America*, 979 F.2d 195, 198 (11th Cir. 1992). In *Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207 (11th Cir. 1999), the Eleventh Circuit Court of Appeals held that an employee's state law contract, bad faith, and fraud claims against the defendants, stemming from the insurer's denial of insurance coverage, were superpreempted by ERISA and were properly recast as claims for benefits due under ERISA plan, since the employee was potential beneficiary of an ERISA plan with standing to sue under ERISA, the insurer was an ERISA entity, and the claims of bad faith refusal to pay and breach of contract both pursued the relief of payment of the insurance benefits. In *Randol v. Mid-West National Life Insurance Company of Tennessee*, 987 F.2d 1547 (11th Cir. 1993), the Eleventh Circuit held that a claim of bad faith refusal to pay benefits under an ERISA plan was preempted. In *Gilbert v. Alta Health & Life Insurance Co.*, 276 F.3d 1292 (11th Cir. 2001), the Eleventh Circuit squarely ruled that a claim of bad faith refusal to pay does not fall within ERISA's savings clause but is preempted by ERISA.

---

[2] Title 29 U.S.C. § 1144(a) provides that the statutory provisions of ERISA "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and are not exempt under section 1003(b) of this title."

Furthermore, fraud and suppression claims generally are preempted by ERISA. *See Englehardt v. Paul Revere Life Insurance Company*, 139 F.3d 1346 (11th Cir. 1998) (fraudulent suppression claim preempted); *Hall v. Blue Cross/Blue Shield of Alabama*, 134 F.3d 1063 (11th Cir. 1998) (suppression claim preempted).


**Is the Group Policy Amendment Applicable to Plaintiff?**

Wilcox contends that the policy amendment, adding the 12-month limitation on LTD benefits for musculoskeletal and connective tissue disorders, does not apply because it was a unilateral change of the contract without consideration, and plaintiff never was given a copy of the amendment prior to the November 19, 2002, letter. In addition, plaintiff argues that the amended policy is ambiguous and unconscionable because it negated his reasonable expectations.

According to the original policy, Standard can validly amend the policy provisions as long as the amendment is approved in writing by one of its executive officers and given to the Policyowner (Turner Industries) for attachment to the Group Policy. The policy itself provides that consideration for the Group Policy is the application of the Policyowner (Turner Industries) and payment by the Policyowner of premiums. [Plaintiff's Exh. 2 at STND370-00024]. The amended policy provides, "If your coverage is changed by an amendment to the Group Policy, we will provide the Policyowner with a revised Certificate or other notice to be given to you." [Plaintiff's Exhibit 4 at STND370-00060]. A review of

the documents related to the amendment shows that the policy was validly amended because the amendment was approved in writing by one of Standard's executive officers and forwarded to Turner for attachment to the Group Policy.

On September 15, 1999, Vickie Witty, Benefits Manager for Turner Industries, sent a letter to Kevin Scroggins at Standard, asking Standard to amend insurance policies effective January 1, 2000, in accordance with their previous discussion. Witty requests amendment of the LTD policy to add a 12-month limitation for a rate change of $.64/1000. [Exh. A to Affidavit of Lisa Gates, Attachment to Doc. #12; Exh. K to Affidavit of Myron Allenstein, Doc. #38]. On March 28, 2000, Standard sent a "Mail-Out Transmittal" to "Scroggins/Hougo" regarding the Group Policy for Turner Industries and Amendments 2, 3, and 4. [Exh. B to Affidavit of Lisa Gates, Attachment to Doc. #12]. The exhibit indicates that the policy amendments and a specimen certificate were attached to the transmittal.

Turner Industries sent a memorandum to its salary employees regarding "Year 2000 Employee Benefit Plan/Rate Changes." [Exh. N to Affidavit of Myron Allenstein, Doc. #38]. The memorandum noted that it was time for annual enrollment in the employee health benefit programs and that it would be renewing its health, dental, and disability insurance programs on January 1, 2000. Employees were advised that all changes to coverage or family status must be received by the Benefits Department by December 15, 1999. Employees also were advised that there would be an increase in the cost of the programs and that "one way to help offset the increasing costs of these programs is to modify

the benefits that are offered." [*Id.* at 1]. The memorandum stated with respect to long term disability programs that there would be a rate increase and that "Beginning January 1, 2000 there will be a 12-month limit on certain conditions." [*Id.* at 3]. The memorandum further provided a contact for any questions about the benefit plans or rate changes. [*Id.* at 1, 3].

Under ERISA, the plan administrator--in this case Turner Industries--is required to furnish to plan participants and beneficiaries a summary plan description and all modifications and changes in the terms of the plan. 29 U.S.C. §§ 1022(a)(1), 1024(b). While plaintiff has argued that he never saw a copy of the amendment at issue prior to its inclusion with the November 19 letter, there is no evidence that Turner Industries did not distribute the memorandum to him, and plaintiff has not asserted a claim against Turner Industries for violating its duties under §§ 1022 and 1024. In fact, it reasonably may be inferred that the memorandum from Turner to its salary employees about the changes effective January 1, 2000, was issued prior to the December 15, 1999, deadline for changes. The memorandum establishes that Turner would have provided information about the policy amendments to any employee making inquiry. That is all that is required by ERISA.

Plaintiff sought a 60-day extension of the discovery deadline in this action to pursue discovery from Turner Industries on the questions of when Turner Industries received notice of the amendment at issue and whether Turner Industries claims that notice of the amendment was given to plaintiff. In response to inquiry from the court on the results of that discovery, counsel for plaintiff has submitted his affidavit. [Doc. #38, Affidavit of Myron

17

Allenstein].   Mr. Allenstein states that he did not conduct formal discovery of Turner. However, he did discuss the matters with counsel for Turner, an employee of Turner, and a former employee of Turner who would have had relevant knowledge. The former employee, Vickie Witty, said she had no recollection of the change in the LTD benefit terms.   John C. Blackman, counsel for Turner, had no knowledge of the change and whether employees were notified.   Mr. Allenstein was provided with a copy of the memorandum noting the implementation of a 12-month limit on LTD benefits for certain conditions.   After investigation, plaintiff's counsel concluded that no one possessed knowledge about the notification issue and believed his client's representation  that he had not received notice of the change in the terms of the policy.

Plaintiff has asserted that *Ala. Code* § 27-14-19 (1975) requires every insurance policy to be mailed or delivered to the insured; therefore, the fact that Standard did not provide him with the policy amendment precludes its enforcement against him.   However, this state statute conflicts with the ERISA requirements and is thus preempted by ERISA. *See Boggs v. Boggs*, 520 U.S. 833, 841, 117 S.Ct. 1754, 1760, 138 L.Ed.2d 45 (1997).   The law is not subject to the ERISA savings clause, 29 U.S.C. § 1144(b).   In *Kentucky Assoc. of Health Plans, Inc. v. Miller*, 538 U.S. 329, 341-42, 123 S.Ct. 1471, 1479, 155 L.Ed.2d 468 (2003), the Supreme Court stated that in order for a state law to be deemed a "law . . . which regulates insurance" under § 1144(b)(2)(A), it "must be specifically directed toward entities engaged in insurance" and "must substantially affect the risk pooling arrangement between

18

the insurer and the insured." The statute in question meets the first test but fails the second. *See Smith v. Pilot Life Ins. Co.*, 14 F.3d 562, 568-71 (11th Cir. 1994) (Georgia statute governing notice to insured of termination of coverage preempted as not affecting risk pooling); *Willett v. Blue Cross and Blue Shield of Alabama*, 953 F.2d 1335, 1341 n.6 (11th Cir. 1992) (Alabama law concerning notice of coverage termination preempted as not affecting risk pooling); *Presley v. Blue Cross-Blue Shield of Alabama*, 744 F.Supp. 1051, 1060-61 (N.D.Ala. 1990) (ERISA preempted Alabama law requiring insurers of group employment health plans to notify plan participants of cancellation or modification of insurance policy occasioned by failure of employer to pay insurance premiums).

In addition, in *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1471 (11th Cir. 1986), the Eleventh Circuit stated that "ERISA simply does not prohibit a company from eliminating previously offered benefits that are neither vested nor accrued." In *Owens v. Storehouse, Inc.*, 984 F.2d 394 (11th Cir. 1993), the Eleventh Circuit found it permissible for a company to amend its employee health plan to add a lifetime benefits cap. Therefore, it cannot be said that the amendment to the LTD benefits policy was unconscionable. The amendment also is not ambiguous, as will be discussed *infra*.

Based on the foregoing, the court finds that the Group Policy amendment, limiting the benefits payable for musculoskeletal and connective tissue disorders, applies to plaintiff.

## What is the Standard of Review?

Plaintiff argues that he is entitled to benefits under any standard of review but submits that a *de novo* standard of review applies because the plan documents do not show a delegation of discretionary authority to Standard. In *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956-57, 103 L.Ed.2d 80 (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

The language in the Group Policy and in the Summary Plan Description makes it clear that Standard is given discretionary authority to determine eligibility for LTD benefits and to construe the terms of the plan. In *Bendixen v. Standard Ins. Co.*, 185 F.3d 939 (9th Cir. 1999), the exact language as contained in the policy at issue here was held to confer sufficient discretionary authority in the LTD plan administrator that any decision as to benefits was to be reviewed under the "abuse of discretion" or "arbitrary and capricious" standard.[3] The same holding, based on the policy language which "unambiguously conferred discretion," was reached in *Newcomb v. Standard Ins. Co.*, 187 F.3d 1004, 1006 n.3 (9th Cir. 1999). The arbitrary and capricious standard was applied with a policy containing the same language, without discussion, in *Kaus v. Standard Ins. Co.*, 162 F.3d 1173 (table) (10th Cir.

---

[3] The Eleventh Circuit equates the arbitrary and capricious standard and the abuse of discretion standard in post-*Firestone* cases. *See, e.g., Jett v. Blue Cross & Blue Shield of Ala.*, 890 F.2d 1137, 1139 (11th Cir. 1989); *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37, 38-39 (11th Cir. 1989).

1998). Because the language of the policy and the Summary Plan Description delegates discretionary authority to Standard, a *de novo* standard of review is not applicable to the administrator's decision.

The Eleventh Circuit has recognized that in some circumstances, a "heightened" arbitrary and capricious standard should be applied to benefits determinations. In *Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556 (11th Cir. 1990), the Eleventh Circuit stated:

> We conclude, then, as has one district judge in an opinion since *Firestone*, that a "strong conflict of interest [exists] when the fiduciary making a discretionary decision is also the insurance company responsible for paying the claims. . . ." *Jader v. Principal Mutual Life Ins. Co.*, 723 F.Supp. 1338, 1343 (D.Minn. 1989). The inherent conflict between the fiduciary role and the profit-making objective of an insurance company makes a highly deferential standard of review inappropriate. . . . We therefore hold that the abuse of discretion, or arbitrary and capricious, standard applies to cases such as this one, but the application of the standard is shaped by the circumstances of the inherent conflict of interest.
>
> * * * * * *
>
> [W]e hold that when a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest. That is, a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries.

*Id.* at 1562-63, 1566-67. "It is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of *de novo* review before a reviewing court is concerned with the self-interest of the fiduciary." *Id.* at 1566 n.12. Whether a claim decision is arbitrary and capricious requires a determination "whether there was a reasonable basis for [Standard's] decision, based upon the facts as known to the administrator at the time the decision was made." *Jett v. Blue Cross & Blue Shield of Alabama, Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989).

The difference in the various standards to be applied and their actual application was discussed at length by the Eleventh Circuit in *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132 (11th Cir. 2004):

> *De novo* review, which we employ in reviewing "no-discretion" plan decisions, offers the highest scrutiny (and thus the least judicial deference) to the administrator's decision. In fact, we accord no deference there, since, no judgment/discretion was exercised in making the determination (i.e., there is no discretion to which we would defer).
>
> In contrast, where the administrator has discretion (i.e., applies his own judgment) in making plan decisions, we review under the arbitrary and capricious standard (which is substantively the same as the "abuse of discretion" standard, *Shaw*, 353 F.3d at 1284-85 n.6). We use it to avoid judicial second guessing/intrusion by according the most judicial deference (and thus, the least judicial scrutiny).
>
> Finally, where the administrator has discretion but exercises it under a conflict of interest, we apply "heightened arbitrary and capricious" review. There we apply a level of deference (and conversely, scrutiny) somewhere between what

is applied under the *de novo* and "regular" arbitrary and capricious standards.

In *HCA*, we incorporated these varying levels of judicial review in a multi-step approach. For clarity, we recapitulate that approach (240 F.3d at 993- 95) in a simpler version here, for use in judicially reviewing virtually all ERISA-plan benefit denials [based on plan interpretations as well as on factual determinations]:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
(5) If there is no conflict, then end the inquiry and affirm the decision.
(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

We described "heightened arbitrary and capricious review" *supra* as somewhere between the *de novo* and "mere" arbitrary and capricious standards. But where is that "somewhere"? Supreme Court decisions have not explained it. *See Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 390-94 (3rd Cir. 2000). "[C]ircuit courts agree that a conflict of interest triggers a less deferential standard of review . . . [but] . . . differ over how this lesser degree of deference alters their

> review process." *Chambers v. Family Health Plan Corp.*, 100
> F.3d 818, 825 (10th Cir. 1996).
>
> Our circuit, at least in plan interpretation cases (unlike
> this, a factual determination case), has incorporated a two step,
> burden-shifting, approach:
>
> (1) The claimant shows that the administrator of a
> discretion-vesting plan is conflicted.
> (2) The administrator then proves that his plan interpretation
> was not tainted by self-interest.
>
> *See Brown*, 898 F.2d at 1566. A wrong but apparently
> reasonable interpretation is arbitrary and capricious if it
> advances the conflicting interest of the administrator at the
> expense of the claimant. *Id.* at 1566-67. But, if the
> administrator can demonstrate a routine practice or give other
> plausible justifications--such as benefitting the interests of other
> beneficiaries--judicial deference to it may be granted, since
> "[e]ven a conflicted [administrator] should receive deference
> when [he] demonstrates that [he] is exercising discretion among
> choices which reasonably may be considered to be in the
> interests of the participants and beneficiaries." *Id.* at 1568.

*Id.* at 1137-39 (footnotes omitted). Regardless of whether the arbitrary and capricious or

heightened arbitrary and capricious standard of review applies, the court first evaluates the

claims administrator's interpretation of an ERISA plan to determine whether it is "wrong,"

the label used to describe the conclusion a court reaches when, after reviewing the plan

documents and disputed terms *de novo*, the court disagrees with the claims administrator's

plan interpretation; if the decision was not "wrong," then summary judgment must be entered

in favor of the administrator, but if the decision was "wrong," the court then will decide

whether the administrator's decision was nevertheless reasonable in light of the facts known

24

to the administrator at the time the decision was made. *Barchus v. Hartford Life and Acc. Ins. Co.*, 320 F.Supp.2d 1266, 1284 (M.D.Fla. 2004).

In this case, Standard acknowledges that any disability claims under the Group Policy were to be paid out of Standard's assets and, thus, a heightened arbitrary and capricious standard is appropriate. [Doc. #39]. However, it maintains that its decision was *de novo* correct; therefore, it is due to be upheld. Plaintiff maintains that the decision, when reviewed *de novo*, was wrong and that Standard's decision cannot survive the heightened arbitrary and capricious scrutiny.

## Can Plaintiff Submit Subsequent Evidence to Establish Entitlement to Benefits?

Plaintiff has filed a Motion to Allow Additional Evidence [Doc. #31], in which he asks to submit the decision of the Social Security Administration (SSA) issued January 26, 2004, awarding him disability benefits and finding that his disability began on November 13, 2000. The SSA determined that plaintiff "has the medically determinable severe impairments of chronic lumbar disk disease and right lumbar radiculopathy." Defendant argues that the SSA's determination is not relevant to the determination of whether plaintiff is entitled to LTD benefits under the terms of its policy.

In *Kirwan v. Marriott Corp.*, 10 F.3d 784 (11th Cir. 1994), the Eleventh Circuit stated that a district court may consider the SSA's determination of disability in reviewing a plan administrator's determination of benefits. *Id.* at 790 n.32. In *Kirwan*, the court was

25

conducting a *de novo* review of a benefits determination, and the SSA had issued a decision

that the plaintiff had become disabled on the date of his termination from employment. In

*Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 n.5 (11th Cir. 1997), a case decided

under the "arbitrary and capricious" standard, the Eleventh Circuit stated that although a

court may consider an award of SSA benefits in reviewing a plan administrator's decision

regarding eligibility for benefits under an ERISA-governed plan, such an award is not

dispositive of the issue of whether a plan administrator's decision to deny benefits is due to

be upheld. The *Paramore* court also noted that the SSA decision was rendered after the

decision to deny benefits and was not available to the administrator during the relevant time

frame. *See also Whatley v. CNA Ins. Cos.*, 189 F.3d 1310 (11th Cir. 1999) (*de novo* review

conducted; SSA benefits award considered but not dispositive).

Plaintiff also has filed a Motion to Allow Additional Submission [Doc. #33], in which

he asks to submit an MRI dated November 18, 2003. The MRI shows that at the L5-S1 level,

there is a disk protrusion that effaces the ventral aspect of the thecal sac and abuts the

proximal transversing S1 nerve roots and extends into the neural foramen where it abuts the

exiting right L5 nerve root. In short, this MRI taken after the final determination as to LTD

benefits by Standard appears to show a progression of plaintiff's condition to the point that

he might qualify for LTD benefits now.

A reviewing court in an ERISA case generally is limited to considering only the

evidence that was before the decision maker at the time of the decision. *Jett*, 890 F.2d at

1139. In *Kirwan*, the Eleventh Circuit held that a court conducting a *de novo* standard of review may consider any relevant evidence in existence regarding an individual's disability at the time the plan administrator's decision was made, regardless of whether this evidence was made available to the administrator. 10 F.3d at 789. In *Parness v. Metropolitan Life Ins. Co.*, 291 F.Supp.2d 1347 (S.D.Fla. 2003), the court stated that when analyzing an insurer's discretionary decision to deny LTD benefits to a participant in an ERISA-governed plan under the heightened arbitrary and capricious standard, a district court's review of the insurer's legal and factual conclusions was limited to the record before the insurer at the time it made the decision. In *Mattive v. Healthsource of Savannah, Inc.*, 893 F.Supp. 1559 (S.D.Ga. 1995), the court stated that when determining whether an ERISA health benefits plan participant has proposed a sound interpretation of the plan, for purposes of the heightened arbitrary and capricious standard of review, the court looks only to facts known to the insurer at time that it made its decision to deny coverage and makes a *de novo* interpretation of the terms of the plan. *See also Stanley v. Metropolitan Life Ins. Co.*, 312 F.Supp.2d 786 (E.D.Va. 2004) (although asserted conflict of interest on part of employee welfare benefit plan administrator does not justify discovery beyond administrative record before administrator at time of benefits decision, such a conflict of interest does mandate a heightened abuse of discretion standard in reviewing administrator's decision); *Sanderson v. Continental Cas. Corp.*, 279 F.Supp.2d 466 (D.Del. 2003) (in reviewing plan administrator's decision to deny benefits to participant in ERISA plan under heightened

27

arbitrary and capricious standard, district court may consider all evidence available to administrator during entire appeals process); *Oslowski v. Life Ins. Co. of North America,* 139 F.Supp.2d 668 (W.D.Pa. 2001) (in determining whether ERISA plan administrator's decision to terminate employee's long term disability benefits was arbitrary and capricious under a heightened standard, court could consider only the evidence that was before the administrator when it made this decision). *Cf. Shipp v. Provident Life & Acc. Ins. Co.,* 214 F.Supp.2d 1241 (M.D.Ala. 2002) (expert's opinion as to reliability of ERISA plan expert's assessment of participant's occupational requirements was admissible in summary judgment proceeding to assist court in reviewing plan administrator's decision to deny disability benefits under heightened arbitrary and capricious standard, even though expert's opinion was not before plan administrator at time decision was made).

There are two problems with the consideration of the additional evidence submitted by plaintiff. First, this court, in applying the heightened arbitrary and capricious standard, is limited to the information before the plan administrator at the time the decision was made to terminate plaintiff's LTD benefits and through the administrative appeals process. The MRI in question was done well after the final decision and was not considered by Standard or its consulting physician. The SSA's determination also was not before the administrator at any time before the final decision. While the SSA's decision may have some bearing, the cases allowing consideration of a subsequent SSA disability determination applied a *de novo* standard. In any event, the fact that the SSA found that plaintiff has right lumbar

28

radiculopathy does not mean that the condition was documented by electromyogram, as required by the ERISA plan. Second, the fact that plaintiff may now meet the requirements for LTD benefits under the policy, when he did not before, does not matter because he no longer is an employee eligible for benefits or the opportunity to submit a new and separate claim for LTD benefits. [*See* Plaintiff's Exh. 4 at 19, stating that insurance ends automatically on date employment terminates].

Therefore, plaintiff's Motion to Allow Additional Evidence [Doc. #31] and Motion to Allow Additional Submission [Doc. #33] are DENIED.

## Was the Decision to Limit LTD Benefits Correct?

Plaintiff asserts that, even assuming the amendment is applicable, he is entitled to LTD benefits because his two herniated disks were documented by MRI, citing plaintiff's exhibits 8, 12, and 16. He avers that defendant's final denial of benefits acknowledges the existence of the herniated disks on the one hand, but discounts the evidence established by the MRIs on the other.

Plaintiff's argument ignores the plain language of the policy. The policy amendment provides that LTD benefits are limited to 12 months for musculoskeletal or connective tissue disorders, including any disease or disorder of the cervical, thoracic, or lumbosacral back and its surrounding soft tissue. The limitation will not apply to "herniated disks with neurological abnormalities that are <u>documented by electromyogram, **and** computerized</u>

tomography or magnetic resonance imaging" or "radiculopathies that are documented by electromyogram." [emphasis added]. In plaintiff's case, his January 2001 MRI showed minimal herniation or bulging of three discs with a minimal to no thecal sac indentation. The July 2002 MRI again showed mild to moderate protrusion of the discs with minimal to no thecal sac indentation and no impingement on the proximal S1 nerve roots or any other nerve roots. Electromyogram and nerve conduction studies performed by Dr. Naguszewski were negative. Plaintiff also had a diagnosis of probable radiculopathy. However, plaintiff also had to show positive electromyogram results to go along with the MRI results and diagnosis in order to avoid the policy limitation. He did not do so; instead, as already noted, all EMG studies performed by his treating physicians were negative.

Requiring a benefits claimant to submit definitive, objective evidence of neurological abnormalities or nerve root involvement in order to obtain LTD benefits of longer than 12 months for musculoskeletal or connective tissue disorders, including radiculopathy or any disease or disorder of the cervical, thoracic, or lumbosacral back and its surrounding soft tissue, is not "wrong" as that term is defined in ERISA jurisprudence. In addition, interpretation of the plan language to require such evidence to support plaintiff's claim for LTD benefits for such conditions is not "wrong." The court does not disagree with the claims administrator's plan interpretation. Accordingly, because the decision was not "wrong," then summary judgment must be entered in favor of Standard and against plaintiff.

**<u>Is Plaintiff Entitled to a Remand of His Case to Standard for Reconsideration of His</u>**
**<u>Claim for LTD Benefits?</u>**

Plaintiff has filed a Motion to Remand his case to Standard to allow it an opportunity to review his November 2003 EMG [Doc. #23]. The administrative appeals process before Standard has been completed, and the EMG is not a report that was in existence during that process. Instead, it is evidence only of plaintiff's condition subsequent to the time that his request for reinstatement of his benefits was finally denied. Further, because the court has not found that the plan administrator's decision was wrong, remand is not required. Therefore, the Motion to Remand is DENIED.

A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this _____ day of September, 2004.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE